## Case No. 13,313.

### The STAR OF HOPE.

[2 Sawy. 15.] [1]

District Court, D. California.    May 8, 1871. [2]

SHIPPING—PLACE OF STORAGE—BILL OF LADING—SUPPLEMENTAL AGREEMENT—EVIDENCE.

1. Where goods were received on board a vessel marked "in cabin state-room," and an extra freight was paid in consideration of their being so carried; and the receipts given for the goods specified that they were to be carried in the cabin, but the bill of lading, by an evident mistake, was in the usual form; and the goods were not stowed in the cabin, and sustained damage in consequence; held, that the libellant was entitled to recover.

2. That though parol evidence of an agreement that goods shipped under a clean bill of lading should be carried on deck is inadmissible, yet such evidence may be received to show a supplemental agreement for a particular mode of stowage under deck.

3. When such evidence has been taken on commission, the interrogatories of which were settled before the judge without objection, and the testimony was directly responsive to such interrogatories, whether it is not too late, at the hearing, and after publication of the depositions, to object that such evidence is inadmissible. Quere?

In admiralty.

H. & C. McAllisters, for libellants.

H. H. Patterson and H. J. Howe, for claimants.

HOFFMAN, District Judge. The libel in this case is filed to recover damages for injuries to certain bags of nuts and boxes of almonds shipped on board the above vessel, to be delivered at this port. The injury to the goods is admitted, and it is not denied that it was caused by heat and sweat.

The claim of the libellants is founded on an alleged breach of a special contract by which the goods were to be placed in the cabin or cabin state-rooms. The bill of lading is in the usual form. As the goods were stowed under deck, and all proper diligence to prevent sweat by ventilators, removing of hatches in fair weather, etc., etc., was shown to have been exercised on the part of the ship, the libellants, to sustain this action, must show either a notorious and well-established usage of trade, which re-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 17 Wall. (84 U. S.) 651.]

quires goods of this description to be stowed in the cabin, or a special contract by which the carrier agreed so to stow them. Several witnesses were called to prove the usage contended for, but they failed, in my opinion, to show such an established, well-understood and generally recognized usage, as would justify a court in accepting it as a tacit element of the contract, modifying and controlling what would otherwise be its legal interpretation. It undoubtedly appears to have been the practice for several years, of the few houses in this city which import these goods, to require them to be carried in the cabin. But this is in all cases effected by entering into a special contract; the bills of lading invariably containing a note or memorandum expressing the agreement. This fact alone not merely accounts for the practice, but is inconsistent with the idea of any usage of trade which would bind the ship so to carry the goods in the absence of a special contract, or which would permit her so to do, if that mode of stowage were disadvantageous to the goods. That such a special contract was made, with respect to the goods in question in this case, is established, in my opinion, beyond a doubt.

All the packages were distinctly marked "in cabin state-room," and being so marked were received on board. The freight per foot paid on these goods was forty-five cents, while on goods which were to be stowed under hatches only forty cents were charged.

The agent of the ship-owners, the shipping clerk, and the receiving clerk, all testify that the receipts given for the goods when just delivered, specified that they were to be stowed in the cabin. Those receipts which were delivered up by the shippers on receiving their bills of lading have not been produced. They appear to have been lost or returned to New York since the commission to take testimony at that city has been executed. The secondary evidence of their contents, and the direct testimony of the ship's agents as to the agreement, and understanding of the parties leave no room for doubt as to its nature.

It is objected that this testimony is inadmissible to contradict, or modify, the effect of the bill of lading.

In the case of The Delaware [unreported], it was held by this court, that evidence of a parol agreement, that certain goods shipped under a "clean bill of lading" might be carried on deck, was inadmissible.

The authorities on the point are conflicting, and it is not certain that the judgment of this court will be affirmed.

But, assuming that decision to be correct, it does not necessarily follow that it would be decisive of the question presented by this case at bar.

The duty of the carrier to safely stow under deck goods confided to his care is of paramount obligation. By article 12, lib. 2,

tit. 1, of the Ordonnance de la Marine, masters were expressly forbidden to stow any merchandise on deck, without the consent or order of the shippers. The bill of lading in the usual form has universally been held to import an obligation to carry the goods in the usual manner—that is, under deck. Undoubtedly a well established usage to carry goods on deck, growing out of necessity, as in the case of acids, inflammable oils, and the like, or suggested by convenience, as in the case of lumber vessels, or those engaged in navigation, au petit cabotage (1 Valin, Comm. p. 397), will justify a departure from the rule. But the evidence of such usage does not contradict the bill of lading, nor modify the contract. No mode of stowage is usually specified in the bill. It is, therefore, held to import an obligation to carry in the usual manner, that is, in the manner in which goods of the kind received are usually carried on voyages similar to that contemplated in the contract. Evidence to show what that usage is, merely interprets and fixes the meaning of the bill of lading; it does not contradict or alter its terms.

But it does not necessarily follow that, if the parties have agreed to a special mode of stowage under deck, as that the goods shall be stowed in the hold, on the between decks, in the run, or directly underneath the hatches or the like, that such a supplemental agreement may not be proved by parol. The parties are competent so to contract; nor need their contract be in writing. It does not contradict the terms of the bill of lading. It is a new and independent condition. In the case at bar, the agreement was that the goods were to be carried under deck, but in a particular part of the ship, to wit: in the captain's cabin. It is not like an agreement that the goods shall be carried on deck, where they are necessarily exposed to vastly increased risks, both of direct damage, and of liability to jettison; and where written evidence of the shipper's consent may reasonably be exacted before a forbidden mode of stowage can be deemed to have been agreed on; but it is an additional stipulation, not inconsistent with the terms of the written contract, and intended to secure greater safety to the goods. I am inclined, therefore, to think that parol evidence of a contract, such as that set up in this case, ought to be received. It may moreover be doubted, whether the claimants are now at liberty to raise the objection.

The evidence was obtained under a commission, the interrogatories to which were settled by the judge without objection. The testimony is directly responsive to the interrogatories, and it establishes, beyond controversy, what were the terms of the written receipts given for the goods, when delivered to the ship. If it had been proposed to object that these written receipts, or secondary evidence of their contracts, were not admissible, on the ground that the preliminary writings were merged in the bill of lading, which contains the final contract between the parties, and that no parol evidence could be given of any other contract than that contained in the bill of lading, the objection to interrogatories, designed to elicit such proof, should have been taken before the commission was sent.

But if the conclusions already arrived at be erroneous, the right of the libellants to recover may perhaps be maintained on another ground. It is, I think, evident from all the circumstances of the case, that the words "in captain's cabin," were omitted in the bill of lading by mistake. Independently of the evidence afforded by the marks on the packages, the rate of freight charged, and the testimony of the agents of the ship, as to the shipping receipts, the libellants have shown it to have been their invariable practice for a series of years, to exact bills of lading for goods of this description, containing the words "in cabin," or "in cabin state-room." They produce seventy-one such bills for various shipments received by them since 1858; twenty of which were for goods shipped to them by the consignors of the goods in this case. They have been unable to find a single bill in which those words were omitted. The evidence of mistake is therefore conclusive. That such evidence is admissible was held in Chouteaux v. Leeck, 18 Pa. St. 224.

In that case the judge at nisi prius, left it to the jury to say whether certain printed words in the bill of lading had not been left unerased by mistake. And if they so found, they were instructed to treat the instrument as if those words were omitted. This instruction was affirmed by the supreme court on error.

If, in a common law court, it was admissible to reform and correct an instrument, so as to make it conform to the real intention of the parties, a fortiori, it should be done in a court of admiralty, which is largely governed by equitable principles, and is called the "Chancery of the Seas." The Juliana, 2 Dod. 521. It is true that a court of admiralty cannot entertain a libel to reform a contract though clearly a maritime one, nor have they any jurisdiction to enforce contracts leading to maritime contracts, such as a contract to build a ship, to sign a shipping paper, to execute a bottomry bond. But if the contract be an executed maritime contract, the jurisdiction attaches, and the admiralty may then administer relief upon that contract according to equity and good conscience. Andrews v. Essex Fire & Marine Ins. Co. [Case No. 374]. On the whole, I am of opinion, that no technical obstacle exists to a decision of this case according to justice and its obvious merits.

The total value of the goods in this market at the time of delivery, if sound, would have been $2,695.50. They were sold at auction by the libellants after due notice to the

ship. The amount received from the auctioneer was $554. A decree for the difference between these amounts, viz.. $2.141.50, must be entered.

[NOTE. On appeal to the circuit court. the above judgment was affirmed. Case unreported. Claimants then appealed to the supreme court. where the decree of the circuit court was affirmed. 17 Wall. (84 U. S.) 651.]